UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION


-----------------------------------------------------------

In re:
Willis A. Glanton and Kathy H. Glanton,
611 Beaver Dam Run, Durham NC 27703                Case No.: 10-82315


Soc. Sec. No. xxx-xx-4951 & xxx-xx-0601


                                           Debtors.
------------------------------------------------------------
-


## DEBTORS'  MEMORANDUM OF LAW IN OPPOSITION TO THE CHAPTER 13 TRUSTEE'S OBJECTION TO CONFIRMATION OF PLAN

The Debtors, Willis A. Glanton and Kathy H Glanton, through counsel

undersigned, respectfully submit this Memorandum of Law in Opposition to the Chapter

13  Trustee's Objection to Confirmation.

## FACTUAL SUMMARY

In May of 2010, after 13 years as an employee at the National Return Center

warehouse in Durham, North Carolina, Willis Glanton was involuntarily terminated from

his position as a warehouse clerk. While unsuccessfully seeking employment, he began

receiving unemployment benefits in the amount of $1,200.33 per month beginning in

June of 2010.   The Glantons attempted to stay current with their monthly obligations, but

soon became hopelessly behind. On December 29, 2010, the Glantons filed for Chapter

13 bankruptcy protection, proposing a plan payment of $193.00 per month for 36 months

with no dividend to unsecured creditors.  The Glantons have a total of $147,778.87 in

1

unsecured debt, of which $127,896.84 is non-dischargeable student loans.

As reflected on Official Form B22C, Willis Glanton received unemployment compensation in the amount of $1,200.33 per month in the 6 months prior to the filing of his petition and continues to receive this amount currently. The benefit amount has not been included in the calculation of the Glantons current monthly income ("CMI"). Instead, the Glantons have noted the monthly benefit amount at Line 8 under the option "unemployment compensation claimed to be a benefit under the Social Security Act". Based on the exclusion of these benefits, the Glantons (hereinafter, the "Debtors") are below median and have no disposable monthly income to devote to general unsecured creditors.

On January 14, 2011, the Chapter 13 Trustee objected to confirmation of the Debtors' proposed plan, on the basis that unemployment compensation is not a benefit received under the Social Security Act, and should therefore be included in the calculation of current monthly income.

### ISSUE BEFORE THE COURT

Whether unemployment compensation, received under provisions of the Social Security Act, should be excluded from the Debtors' calculated current monthly income.

## ARGUMENT

**I.**     **Under a plain language reading of the statute, unemployment compensation should be excluded from CMI because it falls squarely within the meaning of the term "benefits received under the Social Security Act".**

The interpretation of the Bankruptcy Code starts "where all such inquiries must begin: with the language of the statute itself." Ransom v. FIA Card Servs. N.A., 131 S. Ct. 716, 723-24, 178 L. Ed 2d 603 (2011)(citing United States v. Ron Pair Enters., Inc. 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L. Ed 290 (1989)).   When the statute's language is plain, "the sole function of the courts is to enforce the statute according to its terms" where the disposition required by the text is not absurd.  Ron Pair, 489 U.S. at 241.  See also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1.  It is with this principle of statutory construction in mind that we first look to the definition of current monthly income, defined at 11 U.S.C. §101(10A) as follows:

The term "current monthly income"-... (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), **but excludes benefits received under the Social Security Act**.... (emphasis added).   The question squarely before the court is thus whether unemployment benefits, established under the regulatory framework of the Social Security Act and funded almost exclusively under provisions of the Social Security Act, are a benefit received under the Social Security Act.

Of the courts that have examined this issue, two have found that unemployment

3

benefits are a benefit received under the Social Security Act, and therefore excludable from the CMI calculation.  See  In re Sorrell, 359 B.R. 167 (Bankr S.D. Ohio 2007) and In re Munger 370 B.R. 21 (Bankr D. Mass. 2007).

Other courts, with varying levels of analysis, have concluded that unemployment benefits are not a benefit under the Social Security Act, and therefore should be included in CMI.  See In re Washington, 438 B.R. 348 (N.D. Ala. 2010), In re Baden, 396 B.R. 617 (Bankr M.D. Pa. 2008); In re Kucharz, 418 B.R. 635 (Bankr C.D. Ill. 2009); In re Overby, 2010 WL 3834647 (Bankr. W.D. Mo. 2010); In re Winkles, 2010 WL 2680895 (Bankr. S.D. Ill. 2010); In re Nance, 2010 WL 2079653 (Bankr S.D. Ind. 2010); and In re Rose, 2010 WL 2600591 (Bankr N.D. Ga. 2010).

There is no debate that the Debtor's unemployment compensation is a "benefit". See Washington, 438 B.R. 351 n.2.   Nor is there any question that the benefit has been "received" by the Debtor.  Rather, the question turns on whether the benefit is "under" the Social Security Act.  As the court noted in In re Kucharz, "the preposition 'under' is both the cause of and the key to unlock the mystery.  In the context of its usage in Section 101(10a), 'under means 'required by' or 'in accordance with'. In re Kucharz, 418 B.R. 635 at 641 (citing Webster's Third New International of the English Language Unabridged (1976)).  The Debtors' position is that the SSA not only directs how the states must administer their unemployment benefit programs, but also provides for the *funds* which are currently being used by most states to fund their depleted unemployment trust funds. Accordingly, this court must find, on a purely textual review, that the benefits received by Mr. Glanton in this case were received *under* provisions of the Social Security Act, and should therefore be excluded from the CMI calculation.

### A. Unemployment compensation benefits are specifically provided for under multiple provisions of the Social Security Act.

Since its inception in 1935, the Social Security Act ("SSA") has had two major social insurance components: the Federal Old Age, Survivors, Disability and Hospital Insurance (OASDHI") program, including Title II and Title XVIII (Medicare) of the SSA, and the federal-state unemployment compensation program, Titles III, IX and XII of the Social Security Act.

The unemployment compensation provisions of the SSA, like many titles in the Act, outline a joint federal-state program. States are not required to enact unemployment compensation laws, but when they do, they must strictly comply with provisions of the SSA. See 42 U.S.C. § 503. For example, a state must pay unemployment compensation claims "when due," provide a fair and impartial hearing, and allow a claimant to deduct health insurance or income tax in accordance with a program approved by the Secretary of Labor. Further, a state must make periodic reports to the Secretary of Labor and make information available to the Secretary of Labor concerning individual claimants. Absent compliance with these specific requirements, federal funding must stop immediately. 42 U.S.C. § 503. "These mandates are inextricably entwined with the Social Security Act" In re Sorrell 359 B.R. at 181.

The overall administration of state plans is funded by the SSA. 42 U.S.C. § 501 (2004). See Cal. Dep't of Human Res. Dev. V. Java, 402 U.S. 121, at 125 (1971). Through this system, the federal government is able to "furnish federal money for the administrative expenses of state unemployment compensation programs as an

5

inducement to the states to adopt programs that would achieve the larger objects [of humane assistance and macroeconomic benefits]." Jenkins v. Bowling, 691 F.2d 1225 (7th Cir. 1982).

In addition to the regulatory and administrative framework, Title XII of the SSA provides direct funding for state unemployment insurance trust funds when the state benefit account has been depleted. Under the Title XII scheme, the Governor of a state must apply for advances from the Federal Unemployment Account in accordance with the procedure set forth in 42 U.S.C. § 1321 of the SSA. The advances received by the state may **only** be used for the payment of unemployment compensation benefits. The relevant provisions of Title XII of the SSA provide:

> "Advances shall be made to the States from the Federal
> unemployment account in the Unemployment Trust Fund as
> provided in this section, and shall be repayable, with interest to the
> extent provided in section 1202(b), in the manner provided in
> sections 901(d)(1), 903(b)(2), and 1202. **An advance to a State
> for the payment of compensation** in any 3-month period may be
> made if–
> (A) the Governor of the State applies therefor no earlier than the
> first day of the month preceding the first month of such 3-month
> period, and
> (B) he furnishes to the Secretary of Labor his estimate of the
> amount of an advance which will be required by the State **for the
> payment of compensation** in each month of such 3-month
> period."
>
> 42 U.S.C. § 1321(a)(1)

The SSA further defines compensation as used in this subsection as "cash benefits payable to individuals with respect to their unemployment, exclusive of expenses of administration". 42 U.S.C. 1321(A)(3)(C).

In normal economic conditions, Title XII advances are not necessary to fund state

6

unemployment insurance trust funds.  As the GAO notes, "the (unemployment insurance)

program was designed to be forward funded and self-financed by states, with each state trust fund

building up reserves from employer taxes during periods of economic expansion in order to pay

UI benefits during economic downturns."  U.S. General Accounting Office. U.S.

Unemployment Insurance Trust Funds, Long-standing State Financing Policies Have

Increased Risk of Insolvency GAO 10-440. Washington, DC: General Accounting

Office, 2010. http://www.gao.gov (accessed June 4, 2011).  However, in the current

recession, states have become increasingly dependent on Title XII advances to meet

existing unemployment benefit obligations.  As of June 8, 2011, there were 30 states with

outstanding Title XII loans totaling $40,723,505,102.17.  Of these 30 states, North

Carolina ranked 6th in total Title XII advances, with current outstanding loans of

$2,467,076,709.69.  United States Dept. of Labor, Trust Fund Loans,

http://workforcesecurity.doleta.go/unemploy/budget.asp#tfloans) (accessed June 10,

2011).

     **B.**      **North Carolina unemployment compensation benefits paid from May 2010 through April of 2011 are directly attributable to funds received by the state under Title XII of the Social Security Act.**

The North Carolina unemployment insurance fund has been insolvent since

February of 2009.  N.C. Employment Sec. Comm., February 2009 Report on Monthly

Activity. (http://www.ncesc1.com/pmi/activityRpts/activitymain.asp)[1].  In early 2009, in

anticipation of the shortfall,  North Carolina received its first Title XII advance of $114

---

[1]For the court's convenience, the Employment Security Commission monthly
activity reports for February 2009 through April 2011 are attached as Exhibit A.

million dollars. Id.  Since February of 2009, the state of North Carolina has continued to

take Title XII draws from the Federal Unemployment Account to pay the ongoing

unemployment benefits which it can no longer afford.  As a result, the North Carolina

unemployment insurance trust fund, from which benefit payments are made, is operating

at a $2,771,484,122.00 deficit, while owing outstanding loans under Title XII loans of

over $2.4 billion dollars.  In December 8, 2010, the North Carolina Office of the State

Controller commented on the use of these advances:

> "During fiscal year 2010, the State received regular repayable
> advances from the Federal Unemployment Account (FUA) in
> the amount of $2.29 billion to continue financing the operating
> deficit in the State's unemployment compensation fund.
> **Proceeds from the advances were used to pay state
> unemployment benefits.**  Currently, the repayable advances
> are payable solely from the  unemployment tax contributions
> and these contributions will be used specifically for paying
> down the debt until it is settled.   Meanwhile, the state
> unemployment benefits will continue to be paid from the
> repayable advances."

North Carolina Office of the State Controller Comprehensive Annual Financial Report
(CAFR) Fiscal Year Ended June 30, 2010 at Page 81 and page 132, *available at*
http://www.ncosc.net/financial/10CAFR/index.html.

    This is in direct contrast to the  facts described in In re Kucharz and In re

Winkles, both cases in which the court found an insufficient link between the Social

Security Act and state unemployment compensation programs.  An essential factor to the

Kucharz and Winkles holdings was the fact that the actual benefit payments were being

paid entirely *by the state from state funds*.  "To the extent that extended benefits may,

from time to time, be required by federal law, and paid, in part, with federal funds, they

are required by the EUCA and by stand-alone bills that are passed in times of high

unemployment, not by the SSA or any amendments to the SSA.  Thus a purely textual

analysis favors the conclusion that unemployment benefits are not received under the

SSA."  Kucharz, 396 B.R. at 641.  See also id. at 639 (discussing the surplus balance in

the Illinois Unemployment Trust Fund as of June 30, 2008)[2].

In contrast to the financially solvent unemployment trust funds described in

Kucharz, and Winkles, North Carolina is unable to fund its own unemployment trust fund

and must, pursuant to Title XII of the SSA, routinely apply for fund advances under the

SSA *and use the funds received as specifically directed under the SSA.*.   For this reason,

the court must find, under the plain language of 101(10A)(B), that unemployment

benefits received by the Debtor are a "benefit received under the Social Security Act".


**II.      There is no inherent ambiguity in the language of 11 U.S.C
101(10A)(B), but even if there is ambiguity, there is nothing to
support the Trustee's position that Congress intended for
unemployment compensation to be included in a calculation of CMI.**

The Trustee relies on In re Baden to argue that because the language of 11 U.S.C.

(10A)(B) is ambiguous, the court should look to the legislative intent of Congress to

determine whether unemployment benefits should be excluded in the CMI calculation.

The Trustee argues that to include unemployment benefits in the CMI calculation would

serve the two legislative priorities of Congress in enacting BAPCPA, which the Trustee

asserts are: "(1) Protecting the Bankruptcy system from being abused by ensuring that

those who could afford to pay their debts did pay; and (2) protecting education and

---

[2] As of June 7, 2011, Illinois has a total outstanding Title XII advance balance of
$1,996,088,039.95.

retirement savings from being drained by creditors." In re Baden, 396 B.R. at 622.

This argument was rejected by the courts in Sorrell and Munger.  The court in

Sorrell specifically warned against placing too much emphasis on the oft-cited concept,

"Those who can pay, should pay," noting that Congress itself did not strictly follow this

principle, excluding certain sources of income, such as 401(k) contributions, repayment

of 401(k) loans, and funds devoted to charitable organizations,  from consideration of the

debtor's ability to pay.  Sorrell, 359 B.R. at 178.

Additionally, while certainly one legislative objective of BAPCPA was to stop

abuse of Chapter 7 bankruptcy, this was not the only policy behind the passage of

BAPCPA.  Nor does it override the "fresh start" principle that has remained the

foundation of the Bankruptcy Code for over one hundred years.  See Local Loan Co. V.

Hunt, 292 U.S. 234, 244 (1934); Williams v. U.S. Fidelity & Guar. Co., 236 U.S. 549,

555 (1915).  Furthermore, the exclusion of all benefits received under the Social Security

Act is entirely consistent with the purpose of both Social Security Act and the

Bankruptcy Code, which together serve to protect the most vulnerable of our citizens

when they are unexpectedly and through no fault of their own, unable to meet their most

basic obligations.  The Supreme Court, in addressing the overall purpose of the Social

Security Act, commented:

> "The purpose of the (Social Security) Act was to give
> prompt if only partial replacement of wages to the
> unemployed, to enable workers "to tide themselves over,
> until they get back to their old work or find other
> employment, without having to resort to relief.  California
> Dept. Of Human Resources Development v. Java, 402 U.S.
> 121, 131-32. (1971).

**A .**    **The statutory construction of § 101(10A)(B) read in conjunction with other relevant provisions of BAPCPA supports the conclusion that Congress intended to exclude unemployment compensation from CMI.**

The Trustee further argues, citing <u>Baden</u>, that Congress has distinguished between unemployment benefits and social security benefits in other parts of the Bankruptcy Code, and therefore Congress must have intended to treat unemployment benefits differently than those benefits which "people ordinarily think of (as) Social Security benefits". <u>See also In re Rose</u>, 2010 WL 2600591 (Bankr. N.D. Ga. 2010).   However, it is just as likely that Congress intended to use a more expansive definition at §101 (10)(A)(B) to exclude *all* benefits received under the Social Security Act, including unemployment compensation benefits.

The <u>Sorrell</u> opinion is instructive on this issue, examining other areas of the 2005 Act which contain references specific provisions of the Social Security Act. The court compared section 362(b)(2) (automatic stay exceptions for child support obligations under § 466 of the SSA) section 704(c)(1)(A)(I) (duties of the Trustee with respect to state child support agencies created under the SSA), the broad language contained §101 (10)(A)(B). The court notes that  §101(10)(A)(B) contains the *only* reference to the broader phrase "Social Security Act".   In analyzing these provisions, Judge Waldron commented:

> In all of these examples, Congress did not choose the broad term the "Social Security Act," which is the language chosen in connection with CMI; but rather, selected specific provisions of the Social Security Act.  The CMI definition does not

contain any congressionally limited specific provisions of the Social Security Act. It is appropriate to conclude that when Congress wished to limit the applicability of the Social Security Act, it did so by reference to specific sections. Canons of statutory construction approved by the Supreme Court recognize that congressional enactments which contain particular language in one section of a statute, but omit such particularity in another section, reflect Congress's intention and purpose in such disparate use. BFP v. Resolution Trust Corp, 511 U.S. 531, 537, 114 S.Ct.. 1757, 1761, 128 L. Ed. 2d 556 (1994), citing City of Chicago v. EDF, 511 U.S. 328, 338, 114 S. Ct. 1588, 1593, 128 L. Ed. 2d 302 (1994). See also Keene Corp.v. United States, 508 U.S. 200, 208, 113 S.Ct. 2035, 2040, 124 L. Ed. 2d 118 (1993).

In re Sorrell, 359 B.R. at 183.

The court in Munger adopted the Sorrell reasoning on this issue, finding that based on "canons of statutory construction", unemployment compensation does constitute a "benefit received under the Social Security Act", and is therefore property excluded from CMI. Following Sorrell, the court noted that when Congress intended to distinguish specific social security provisions, it did so expressly, citing 11 U.S.C. 522(d)(10), which allows the Debtor to claim certain property as exempt, relevantly:

(A) a social security benefit, unemployment compensation, or a local public assistance benefit
(B) a veterans' benefit;
(C) a disability, illness, or unemployment benefit.

It follows, the Munger court held, that Congress' choice in wording these references "supports the view that 'a benefit received under the Social Security Act' in § 101(10A)(B) was purposefully intended to be broader than 'a social security benefit.' 'Unemployment compensation' is included in this broader definition.". Munger, 370 B.R. at 25.

12

Where <u>Munger</u> relied on Congress' choice of wording in the Bankruptcy Code as evidence that Congress knew how to distinguish between specific benefits when it intended to do so, the <u>Baden</u> court inexplicably cites this as evidence that Congress intended to exclude unemployment compensation from the definition of "social security benefits" Unfortunately, this conclusion disregards a basic principle of statutory construction, that *differing language* in two provisions of an Act should be given *different meanings*. See <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983). Congress clearly understood how to restrict particular forms of income, and more specifically, how to reference discrete provisions of the Social Security Act. Had it intended to limit the term "Social Security Act" (by referencing specific social security benefits), Congress could have easily done so.

**B.      Congress did not need to explicitly exclude the narrower category of unemployment benefits because unemployment benefits were not included in the pre-BAPCPA determination of disposable monthly income.**

The Trustee further posits that the court "should not assume Congress, in enacting a statute, intended a deviation from established applications of judicial interpretation unless the statute itself effects such a change with specificity". The Trustee cites <u>Baden</u> and a number of pre-BAPCPA cases for the proposition that the "pre-BAPCPA definition of disposable income included unemployment". However, the pre-BAPCPA cases cited by the <u>Baden</u> court and the Trustee only address whether unemployment income may be considered for purposes of feasibility, *not as a determination of disposable monthly income.* See <u>In re Hickman</u> 104 B.R. 374, 377 (Bankr.D.Colo.1989); <u>In re Compton</u>, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988); <u>In re Overstreet,</u> 23 B.R. 712, 713-715

(Bankr.W.D.La.1982).  As such, there was no "established application of judicial

interpretation" regarding unemployment compensation for Congress to explicitly

overturn.  Accordingly, Congress chose to exclude the broader category of "benefits

received under the Social Security Act".


### C. The legislative history supports a finding that Congress, in choosing the exclusions under 101(10A)(B), desired to protect unemployment benefits from the determination of CMI.

 Both the Senate and the House of Representatives considered proposals in 1999

to exclude "benefits received under the Social Security Act" from the definition of CMI.

Upon introduction of the amendment, Senator Edward Kennedy noted the many financial

hardship encountered by older Americans, specifically including the loss of employment

and inability to find suitable employment among those difficulties.  Bankruptcy Reform

Act of 1999: 106th Cong., 1st Sess., 145 Cong. Rec. S 14678 (Nov. 17, 1999) ("in too

many circumstances in our country today, the elderly are discriminated against in terms

of employment) (statement of Sen. Kennedy).  The amendment passed.

The House of Representatives expressed similar concerns.  Representative

Conyers moved to recommit the bankruptcy bill including the amendment commenting:

> "As the law currently stands, any senior is eligible for
> bankruptcy relief.  The bill, however, would force millions of
> seniors living on fixed incomes into mandatory repayment
> plans.  This is because there is no exclusion from the definition
> of "income" for payments received for Social Security,
> retirement, for disability insurance, for supplemental security
> income, or for **unemployment insurance**."

Bankruptcy Reform Act of 1999: 106th Cong., 1st Sess., 145 Cong. Rec. H 2655, 2770

statement of Rep. John Conyers) (emphasis added).   The Congressional record is clear

that when Senator Kennedy and Representative Conyers proposed the amendment to exclude "benefits received under the Social Security Act", Congress was particularly concerned about the plight of unemployed seniors, and intended that the calculation of CMI should exclude all "benefits received under the Social Security Act", *inclusive* of unemployment benefits.

Thus, while the plain meaning of 101(10A)(B) requires the court to find that the phrase "benefits received under the Social Security Act" includes unemployment benefits received under the Social Security Act, the statutory interpretation urged here is also entirely consistent with the expressed legislative intent of Congress.

**III.     Should the Debtor become employed, the Trustee or unsecured creditors may seek modification of the plan pursuant to 11 U.S.C. 1329.**

Finally, it should be noted that the Trustee and unsecured creditors are not without a remedy. The Debtor in this case is certainly willing to provide the Trustee quarterly updates about his employment situation. If in fact the Debtor does obtain full-time employment after confirmation of his plan and his unemployment benefits cease, the Trustee or any unsecured claimant may seek modification of the plan pursuant to 11 U.S.C. 1329.

## CONCLUSION

For the foregoing reasons and rationale above, the Debtors respectfully request that the court deny the Trustee's objection to confirmation, and grant such other relief as the Court deems just and proper.

Dated: June 10, 2011

**LAW OFFICES OF JOHN T. ORCUTT, P.C.**

/s/ Koury L. Hicks

Koury L. Hicks
Attorney for the Debtors
North Carolina State Bar No.:  36204
1738 Hillandale Rd.
Durham, N.C.  27705
(919) 286-1695

16

## CERTIFICATE OF SERVICE

I, Koury L. Hicks, certify under penalty of perjury that I am, and at all times hereinafter mentioned was, more than eighteen (18) years of age and that on June 10, 2011 , I served copies of the foregoing Memorandum of Law by electronic service and/or first class mail upon the following parties in interest:

Richard M. Hutson, II
Standing Chapter 13 Trustee

Benjamin E. Lovell
Attorney for the Chapter 13 Trustee

Michael West
U.S. Bankruptcy Administrator

Willis and Kathy Glanton
611 Beaver Dam Run,
Durham NC 27703

/s/Koury L. Hicks
Koury L. Hicks